**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:                                                                    Chapter 11

MSR RESORT GOLF COURSE LLC, *et al.*,                                     Case No. 11-10372 (SHL)

                                    Debtors.                              (Jointly Administered)


------------------------------------------------------------------------x
MSR RESORT GOLF COURSE LLC, *et al.*,

                                    Plaintiffs,

                v.                                                        Adv. Pro. No. 11-02920 (SHL)

WALDORF=ASTORIA MANAGEMENT LLC,

                                    Defendant.
------------------------------------------------------------------------x


<u>**MEMORANDUM OF DECISION**</u>

A P P E A R A N C E S:

KIRKLAND & ELLIS LLP
Attorneys for MSR Resort Golf Course LLC, *et al.*
By:    Eric F. Leon, Esq.
       Ryan Morettini, Esq.
601 Lexington Avenue
New York, New York 10022

PERKINS COIE LLP
Attorneys for Waldorf=Astoria Management LLC
By:    David M. Neff, Esq.
       Brian Audette, Esq.
131 South Dearborn Street, Suite 1700
Chicago, Illinois 60603

ALSTON & BIRD LLP
Attorneys for the Official Committee of Unsecured Creditors
By:    Craig E. Freeman, Esq.
       Martin G. Bunin, Esq.
90 Park Avenue
New York, New York 10016

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the merits of the above-captioned adversary proceeding commenced by the Debtors in their jointly administered Chapter 11 case of MSR Resort Golf Course LLC, *et. al.* (collectively, the "Debtors" or the "Plaintiffs"). The Debtors own and operate several iconic luxury resort properties in the United States that are managed by non-affiliated third-parties. Three of the Debtors' properties are managed by Waldorf=Astoria Management LLC ("Hilton or the "Defendant")[1]:  (1) the Arizona Biltmore Resort & Spa located in Phoenix, Arizona ("Arizona Biltmore"); (2) the Grand Wailea Resort Hotel & Spa located in Maui, Hawaii ("Grand Wailea"); and (3) the La Quinta Resort & Club and PGA West located in La Quinta, California ("La Quinta," together with Arizona Biltmore and Grand Wailea, the "Resorts").

The Debtors filed this adversary complaint seeking a declaratory judgment that Hilton is equitably estopped from enforcing certain non-disturbance and attornment agreements, so called NDAs, that provide Hilton with legal recourse for breach of Hilton's management agreements against the Debtors who are the direct owners of the Resorts. The Debtors assert that certain estoppel certificates issued by Hilton in 2007 should have – but, did not – disclose these NDAs. The Debtors complain that they detrimentally relied upon these inaccurate estoppel certificates when making decisions in 2011, including the decision to file this bankruptcy proceeding. For the reasons set forth below, however, the Court concludes that it was unreasonable for the Debtors to rely upon the estoppel certificates because they were issued in 2007 to different parties for a transaction that did not involve the Debtors. Moreover, appropriate due diligence by the Debtors in 2011 would have put them on notice of the possible existence of the NDAs. For all these reasons, the Court rejects the Debtors' claim of equitable estoppel.

---

[1] The term "Hilton" includes its predecessor, 90210 Management Company, LLC ("90210"), its parents, and affiliates.

## BACKGROUND

### A.  The Organization of the Debtors

Each of the Debtors is a wholly-owned indirect subsidiary of non-Debtor CNL-AB LLC ("CNL-AB").   CNL-AB is a joint venture consisting of sophisticated real estate investors.   The Debtors include, but are not limited to, the entities that directly own the Resorts (the "Fee Owners") and the entities that lease the Resorts from the Fee Owners (the "Tenant Entities"). This organization is consistent with the principles relating to real estate investment trusts, or REITs.  A REIT is a corporation or business trust where investors combine their capital "to own and, in most cases, operate income-producing real estate" like the Resorts here.  Peter M. Fass, Donald B. Zeif & Michael E. Shaff, *Real Estate Investment Trust Handbook* § 1.1 (West ed. 2011).  The earnings of a REIT are taxed only at the shareholder level, assuming that the REIT satisfies other applicable requirements, which are not at issue in this case.  *Id.*  To avoid generating revenue that would jeopardize its status under federal tax law, REITs such as the Fee Owners must lease their hotels either to a non-affiliated third party or to a taxable REIT subsidiary, such as the Tenant Entities.  *See Expert Report of Michael F. Feldman* ("Feldman's Report") at 5-6, (ECF No. 45).  A taxable REIT subsidiary also may not operate the hotel, but instead must retain an eligible independent contractor like Hilton to manage the hotel.  *Id.* at 6. Thus, a taxable REIT subsidiary, like the Tenant Entities, is "not much more than a single purpose shell entity formed solely for income tax purposes."  *Id.*

### B.  Hilton's Management Agreements and Related Agreements

Consistent with a REIT structure, Hilton's management agreements are with the four Tenant Entities, but not with the three Fee Owners.  Hilton entered into these management

agreements in 2006.[2]  The term of each Management Agreement is for 20 years, with an option

to renew at Hilton's sole election for an additional 10 years.[3]

At the same time as it entered into these Management Agreements, Hilton also entered

into two other agreements relating to the Resorts where Hilton provided significant value to the

Debtors.  First, Hilton provided a guarantee for the financial performance of the Resorts for up to

$50 million.  Guaranty, Ex. 11 to Joint Exhibit Binder; Hilton's Statement of Material Facts

[ECF No. 25] ("Hilton's Statement") ¶ 9.[4]  Second, Hilton committed to pay more than $20

million for capital improvements for the Resorts.  *Id.* ¶ 7.

To protect its significant economic stake in the Resorts, Hilton simultaneously reached

certain other agreements.  The first of these agreements were the NDAs between the Tenant

Entities, the Fee Owners, and Hilton for each of the Resorts.[5]  Section 2 of each NDA provides

---

[2] The three management agreements between 90210 and the Tenant Entities for each Resort were as follows:  (i) an Amended and Restated Management Agreement between CNL Resort Lodging Tenant Corp. and CNL Resort Biltmore Real Estate, Inc. (the "Arizona Biltmore Tenants"), and 90210 for the Arizona Biltmore; (ii) an Amended and Restated Management Agreement between CNL Resort Lodging Tenant Corp. (the "Grand Wailea Tenant") and 90210 for the Grand Wailea; and (iii) an Amended and Restated Management Agreement between CNL Resort Lodging Tenant Corp., CNL Resort Ancillary Tenant Corp., and CNL Resort Desert Real Estate, Inc. (the "La Quinta Tenants," together with the Arizona Biltmore Tenants and the Grand Wailea Tenant comprise the Tenant Entities), and 90210 for the La Quinta (collectively, the "Management Agreements").  Compl. ¶¶ 13-15 (ECF No. 1).

[3] Arizona Biltmore Management Agreement § 3.1, Ex. 2 to Binder titled *Joint Exhibits of the Debtors and Waldorf =Astoria Management LLC* ("Joint Exhibit Binder"); Grand Wailea Management Agreement § 3.1, Ex. 3 to Joint Exhibit Binder; La Quinta Management Agreement § 3.1, Ex. 4 to Joint Exhibit Binder.

[4] The Guaranty was entered into by 90210, as Manager, and Hilton Hotels Corporation, both as Guarantor, in favor of CNL Resort Lodging Tenant Corp., CNL Resort Ancillary Tenant Corp., CNL Resort Biltmore Real Estate, Inc., CNL Resort Desert Real Estate, Inc., collectively, as Owner, dated as of January 31, 2006.  Guaranty, Ex. 11 to Joint Exhibit Binder; Hilton's Statement ¶ 7.

[5] The three NDAs were as follows: (i) Non-Disturbance and Attornment Agreement by and among CNL Biltmore Resort, LP, as Landlord, CNL Resort Lodging Tenant Corp., as Tenant, and 90210, as Manager, for Arizona Biltmore; (ii) Non-Disturbance and Attornment Agreement by and among CNL Grand Wailea Resort, LP, as Landlord, CNL Resort Lodging Tenant Corp., as Tenant, and 90210, as Manager, for Grand Wailea; and (iii) Non-Disturbance and Attornment Agreement by and among CNL Desert Resort, LP, as Landlord, CNL Resort Lodging Tenant Corp., and CNL Resort Ancillary Tenant Corp., collectively, as Tenants, 90210, as Manager, for La Quinta (collectively, the "NDAs").  Arizona Biltmore NDA, Ex. 5 to Joint Exhibit Binder; Grand Wailea NDA, Ex. 6 to Joint Exhibit Binder; La Quinta NDA, Ex. 7 to Joint Exhibit Binder.

Hilton with the right to sue the Fee Owners, in addition to the Tenant Entities, for damages from

termination of the Management Agreement arising out of the end of the operating lease:

> In the event of a termination or surrender of the Operating Leases
> or the expiration of the term of the Operating Lease, or if Landlord
> otherwise takes possession of the Resort, Manager's rights under
> the Management Agreement shall not be disturbed, the
> Management Agreement shall thereafter continue in full force and
> effect in accordance with the terms thereof as a direct agreement
> between Manager and either Landlord or, Landlord's sole
> discretion, the Successor Tenant . . ., and Landlord, or the
> Successor Tenant, as applicable, shall be liable for the performance
> of all obligations of Tenant under the Management Agreement
> arising from and after the termination, expiration or surrender of
> the Operating Leases and cure of all Events of Default by Tenant
> under the Management Agreement which are possible to cure,
> provided that the Management Agreement has not expired or
> otherwise been terminated in accordance with its terms.

NDAs § 2.  The rights granted to Hilton against the Fee Owners under the NDAs are significant

because the Tenant Entities, with whom Hilton contracted, do not actually own the Resorts, and

have few assets while the Fee Owners have significant assets, including direct ownership of the

Resorts.

To further protect its interests, Hilton executed other agreements, so-called SNDAs,[6]

whereby the Debtors' lenders agreed not to terminate – or direct the Tenant Entities and the Fee

Owners to terminate – the Management Agreements except under certain limited circumstances.[7]

---

[6] For example, a Manager's Consent, Subordination of Management Agreement, and Non-Disturbance Agreement
was entered into by and among CNL Desert Resort, LP, CNL Grand Wailea Resort, LP, and CNL Biltmore Resort,
LP, collectively, as Borrower, CNL Resort Lodging Tenant Corp. and CNL Resort Ancillary Tenant Corp.,
collectively, as Operating Lessee, and 90210, as Manger, for the benefit of German American Capital Corporation,
as Lender (the "SNDA").  SNDA, Ex. 12 to Joint Exhibit Binder; see Ex. 12 to Joint Exhibit Binder for additional
SNDAs.

[7] Hilton's Statement ¶ 17; Decl. of Bernard Lee ¶ 6, Ex. F to Hilton's Statement [ECF No. 25] ("Lee Decl.");
SNDAs § 4(c), Ex. 12 to Joint Exhibit Binder.

### C.  Ownership of the Debtors Since 2007

Prior to CNL-AB acquiring its interests in the Debtors in 2011, the Debtors – and thus, ultimately the Resorts – were owned by an entity known as Morgan Stanley Real Estate Fund V U.S., L.P. ("MSREF") and its affiliates, which acquired its interest in a transaction in 2007 (the "MSREF Transaction").[8]  Hilton's Statement ¶ 39.

In connection with the MSREF Transaction, Hilton issued an estoppel certificate for each of the Resorts on April 11, 2007, two days before the transaction was completed (collectively, the "Estoppels").[9]  Each Estoppel is addressed to two MSREF subsidiaries:  MS Resort Acquisition LLC and MS Resort Holdings LLC.  MS Resort Acquisition LLC acquired the Resorts, and it is a wholly-owned subsidiary of MS Resort Holdings LLC.  Kamensky First Day Aff. ¶ 20.  The Estoppel for each Resort states that:  "This estoppel certificate shall insure to the benefit of the [applicable Tenant Entities] and [MS Resort Holdings LLC]."  *See* Estoppels § 10. While the initial drafts of the Estoppels contained language that the Estoppels inure to the benefit of the successors and assigns of the specified entities, the successors and assigns language was subsequently deleted by Hilton before the Estoppels were executed.   Lee Decl. ¶ 11.

Section 5 of each Estoppel purports to identify any agreements between Hilton and the Tenant Entities with respect to each Resort:

> Other than the Management Agreement, there are no outstanding agreements between Hilton or its affiliates and [applicable Tenant Entities] or its affiliates with respect to the Hotel, except as follows:

---

[8] Pursuant to the MSREF Transaction, the names of the Fee Owners and the Tenant Entities for the Resorts changed. Accordingly, the names of the Fee Owners became MSR Biltmore Resort, LP, MSR Grand Wailea Resort, LP, and MSR Desert Resort, LP, respectively.  The names of the Tenant Entities became MSR Resort Lodging Tenant, LLC, MSR Biltmore Real Estate, Inc., MSR Resort Ancillary Tenant, LLC, and MSR Resort Desert Real Estate, Inc., respectively.  *See* Declaration of Daniel Kamensky [ECF No. 3] ("Kamensky First Day Aff.")  ¶ 20.

[9] *See* Hilton Estoppel-Arizona Biltmore Resort & Spa, Ex. 8 to Joint Exhibit Binder; Hilton Estoppel-Grand Wailea Resort Hotel & Spa, Ex. 9 to Joint Exhibit Binder; Hilton Estoppel-La Quinta Resort & Club and PGA West, Ex. 10 to Joint Exhibit Binder.

> Guaranty dated as of January 31, 2006 given by Hilton and Hilton
> Hotels Corporation ("Hilton Parent") in favor of [the Tenant
> Entities] (the "Guaranty").

Estoppels § 5.  Although the Estoppels disclosed each Management Agreement and the

Guaranty, they failed to disclose the existence of the NDAs or the SNDAs.

### D.  CNL-AB Forecloses on the Resorts in 2011

In January 2011 – almost four years after the Estoppels were issued – the Debtors'

current equity owners CNL-AB[10] foreclosed on certain of its interests thereby replacing MSREF

as the ultimate equity holder of the Debtors, including the Fee Owners and the Tenant Entities.

Debtors' Statement of Undisputed Facts [ECF. No. 22] ("Debtors' Statement") ¶ 39; Kamensky

First Day Aff. ¶ 20.[11]  Prior to the closing of the CNL-AB Transaction, MSREF provided a copy

of the Estoppels to the Debtors.  Compl. ¶ 33; Debtors' Statement ¶¶ 40-41.  The Debtors state

that they first learned of the NDAs on May 25, 2011.  Debtors' Statement ¶ 52.

### E.  This Adversary Proceeding

In their complaint, the Debtors assert that MSREF and certain corporate mezzanine

lenders were unaware of the existence of the NDAs at the time they entered into the MSREF

Transaction, and if they had known of the NDAs, the NDAs would have affected their decision

to acquire the Resorts and to provide financing, respectively.[12]  Compl. ¶¶ 27, 29.  The Debtors

further argue that CNL-AB relied on the Estoppels when it decided, along with certain corporate

---

[10] The entity that indirectly owned the Resorts before MSREF was called CNL Hotels & Resorts, Inc.  Despite the similarities in their names, it is not the same entity as CNL-AB, the current equity holder of the Debtors.

[11] Specifically, CNL-AB "foreclosed on 100 percent of the membership interests in MS Resorts III, LLC (the indirect parent of MSR Resort Lodging Tenant LLC)" that "were pledged as security [for the] $200 million loan to [non-Debtor] affiliate MS Resorts IV, LLC, which is held by CNL-AB (the 'CNL-AB Transaction')."  Compl. ¶ 32; Debtors' Statement ¶ 37; Kamensky First Day Aff. ¶ 6.  Pursuant to the transaction, MS Resort Holdings LLC's interests in the Debtors were eliminated.  Hilton's Statement ¶ 79.

[12] The Debtors claim they have the right to assert equitable estoppel on MSREF's behalf because they claim CNL-AB is the successor-in-interest to certain corporate mezzanine lenders of MS Resort III, LLC.  Debtors' Statement ¶ 37.

mezzanine lenders, to structure the CNL-AB Transaction as a voluntary foreclosure as opposed to an involuntary foreclosure, thereby forfeiting the right to pursue a $75 million guaranty claim against MSREF pursuant to a certain non-recourse carve-out in the mezzanine loans. Compl. ¶ 32; Debtors' Statement ¶ 44; Trial Tr. vol. 2, 174:25-175:8, (ECF No. 59). The Debtors also contend that, based on the lack of NDAs, certain members of CNL-AB took a greater percentage of ownership interest in the Debtors in exchange for a lower percentage of ownership interest in the non-Debtors. Debtors' Statement ¶ 45; Trial Tr. vol. 2, 174:25-175:8. Additionally, the Debtors contend that their restructuring strategy has been based, in part, upon the lack of NDAs and the premise that only the Tenant Entities – and not the Fee Owners – would be liable for the obligations under the Management Agreements. Debtors' Statement ¶¶ 47-52, 55.

In opposition, Hilton argues that the Estoppels should not bar Hilton from enforcing its rights under the NDAs against the Fee Owners. Hilton notes that the Estoppels were directed specifically to certain MSREF entities – MS Resort Holdings LLC and MS Resort Acquisition LLC – and inured only to the benefit of MS Resort Holdings LLC and the Tenant Entities. Hilton argues that CNL-AB, which was not a party to the MSREF Transaction, has no basis to rely on the Estoppels, particularly because the Estoppels do not cover successors and assigns. Hilton also notes that the only two Debtor entities who might have a basis to rely on the Estoppels – the Fee Owners and the Tenant Entities – cannot establish equitable estoppel because both were parties to the NDAs and, therefore, had knowledge of the NDAs' existence. Hilton's Answer at 14-15, (ECF No. 9); Hilton's Memorandum of Law [ECF No. 23] ("Hilton's Memo.") at 2-3, 10.

In late February 2012, the Plaintiffs filed their summary judgment motion and the Defendant cross-moved for summary judgment. Briefing on those motions was completed in

early March 2012.  Rather than wait for a ruling on summary judgment, the Debtors requested

that trial on the merits proceed.  Accordingly, the Court held an evidentiary hearing on March

13, 2012 and March 14, 2012 (the "Hearing").   At the Hearing, the parties agreed that the Court

should determine the merits of the action based upon the materials submitted on summary

judgment, and the testimony of Michael Feldman, Hilton's expert witness on hotel

transactions.[13]  Trial Tr. vol. 1, 7:3-8:19, (ECF No. 58).[14]

  Feldman was a partner for twenty-five years at the national law firm Proskauer Rose

LLP where he founded the firm's Lodging & Gaming practice group.  Throughout his career,

Feldman represented various parties in connection with, but not limited to, the purchase and sale

of hotels, hotel industry mergers and acquisitions, long-term management agreements, troubled

and disputed management agreements, properties and transactions, and restructuring and

bankruptcies in the lodging and gaming sector.  Currently, Feldman is an Adjunct Professor at

New York University, Preston Robert Tish Center for Hospitality, Tourism and Sports

Management where he teaches "Legal Issues in Hospitality" in the graduate program and

"Hospitality and Tourism Law" in the undergraduate program.

  Feldman opined that a reasonably prudent hotel purchaser, investor, or lender involved in

the CNL-AB Transaction would not have relied upon the Estoppels to conclude that the NDAs

did not exist.  In reaching that opinion, Feldman relied upon the fact that the Estoppels were not

directed to CNL-AB and that CNL-AB was not "dealing" with the Tenant Entities, the parties

requesting the Estoppels, when the Estoppels were issued.   Feldman also opined that the

---

[13] The parties agreed to use Feldman's expert report as his direct testimony.  He was cross-examined by the Debtors, with Hilton conducting re-direct examination.

[14] The trial record before the Court consists of the complaint, answer, and each of the parties' record on summary judgment, including accompanying memorandum of law, exhibits, declarations, Feldman's expert report, deposition transcripts, and responses thereto.  The record also includes Feldman's testimony at the Hearing and the parties' Joint Exhibit Binder.  Trial Tr. vol. 1, 7:15-10:22.

Estoppels were "stale" because they were over three years old at the time of the CNL-AB

Transaction, and that the Estoppels specifically stated that they inured only to the benefit of the

Tenant Entities and MS Resort Holdings LLC.  Further, Feldman concluded that a reasonably

prudent hotel purchaser, investor, or lender should have known of the existence of the NDAs, or,

at the very least, be put on notice of their existence given certain provisions in the Management

Agreements and other related documents.

## DISCUSSION

### I.  Equitable Estoppel Standard

The parties agree that equitable estoppel is governed by the laws of the states where the

Resorts are located:  Arizona, California and Hawaii.  The parties also agree that the doctrine has

the same basic elements in each jurisdiction:  (1) the party to be estopped must have had

knowledge of the true facts, but acted inconsistently with respect thereto, and intended that its

conduct be acted upon by the other party; and (2) the party invoking estoppel must have had a

justifiable lack of knowledge and must have reasonably relied upon the other party's conduct to

its detriment.  *See Flying Diamond Airpark, LLC v. Meienberg,* 156 P.3d 1149, 1155 (Ariz. Ct.

App. 2007) ("(1)[T]he party to be estopped commits acts inconsistent with a position it later

adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's

repudiation of its prior conduct.  The party to be estopped must induce reliance by his acts,

representations or admissions intentionally or through culpable negligence.   Resulting reliance

must be justifiable.") (internal citations and quotations omitted); *see also Pueblo Santa Fe*

*Townhomes Owners' Assoc., Inc. v. Transcon. Ins. Co*., 178 P.3d 485, 493 (Ariz. Ct. App. 2008);

*see also Ware Supply Co. v. Sacramento Savs. & Loan Ass'n.,* 54 Cal. Rptr. 674, 680 (1966)

("(1) that the party to be estopped must be apprised of the facts; (2) he must intend that his

conduct will be acted upon, or act in such a manner that the party asserting the estoppel could

reasonably believe that he intended his conduct to be acted upon; (3) the party asserting the

estoppel must be ignorant of the true state of the facts; and (4) he must rely upon the conduct to

his injury.") (internal citation and quotations omitted); *see also Golden Day Schools, Inc. v.*

*Dept. of Educ.*, 69 Cal. App. 4th 681, 693 (1999); *see also AIG Hawaii Ins. Co. v. Smith*, 891

P.2d 261, 266 (Haw. 1995) ("'[T]he party invoking equitable estoppel must show that 'he or she

has detrimentally relied on the representation or conduct of the person sought to be estopped, *and*

*that such reliance was reasonable.*'  Such requirement, however, may be dispensed with in order

to prevent manifest injustice.") (internal citation omitted) (emphasis in original); *see also Zane v.*

*Liberty Mut. Fire Ins. Co*., 165 P.3d 961, 971 n.12 (Haw. 2007).

The party asserting equitable estoppel has the burden of proof as to all elements.  *See*

*Knight v. Rice,* 321 P.2d 1037, 1038 (Ariz. 1958); *Ware Supply Co.*, 54 Cal. Rptr. at 680;

*Gushiken v. Shell Oil Co.*, 1940 WL 7560, at *11 (Haw. 1940).  "It must be met by clear and

convincing evidence[, requiring] a finding of high probability that the fact is true . . . ."  *Otay*

*River Constructors v. South Bay Expressway (In re South Bay Expressway, L.P.)*, 2010 WL

4688213, at *5 (Bankr. S.D.Cal. Nov. 10, 2010) (internal citations and quotations omitted).

Courts generally agree that "[e]quitable estoppel is grounded on notions of fair dealing

and good conscience and is designed to aid the law in the administration of justice where

injustice would otherwise result."  *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 93 (2d

Cir. 2003) (internal citations and quotations omitted).  "Estoppel is equitable; applied too readily,

it is harsh, rife with possibilities of a penalty outweighing the offense; it applies defensively

only, never to give an unfair advantage to the party invoking it."  *People v. Volz*, 25 Cal. App. 3d

480, 488 (1972); *see also Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 918 (9th Cir. 2001)

("'Promissory estoppel is a sword, and equitable estoppel is a shield.'")[15] (internal citation omitted); *Rockwood Bank v. Camp*, 984 S.W.2d 868, 872 (Mo. Ct. App. 1999) ("[E]quitable estoppel is defensive or negative in character."); *Boral Bricks, Inc. v. Old S. Transp. Mgmt., Inc.*, 402 S.E.2d 777, 778 (Ga. Ct. App. 1991) ("[T]he purpose of equitable estoppel 'is to protect a party from loss. It was never intended to work a positive gain.'") (internal citation omitted).

Thus, equitable estoppel is not favored and should be applied sparingly. *See Phillips v. Borough of Keyport*, 107 F.3d 164, 182 (3d Cir. 1997) ("'The doctrine of equitable estoppel is applied 'only in very compelling circumstances,' 'where the interests of justice, morality and common fairness clearly dictate that course.'") (internal citations omitted); *Kemp. Bros. Constr., Inc. v. Titan Elec. Corp.*, 146 Cal. App. 4th 1474, 1482 (2007) ("'[T]he law does not favor estoppels.'") (internal citation omitted); *Landberg v. Landberg*, 101 Cal. Rptr. 335, 346 (Cal. Ct. App. 1972) ("The burden is upon the party alleging estoppel to prove it. Estoppel is not favored by the courts, and it is incumbent upon one who advances it to prove its dominant essentials, leaving nothing to surmise or questionable inference.") (internal citations omitted).

## II.    The Use of Estoppel Certificates

In evaluating the merits of the parties' argument, it is helpful to note that an estoppel certificate is a common device used in real estate transactions where "a party's delivery of [the] statement estops that party from later claiming a different state of facts." *K's Merch. Mart, Inc. v. Northgate Ltd. P'ship,* 835 N.E.2d 965, 971 (Ill. App. Ct. 2005) (quoting *Black's Law Dictionary* 572 (7th ed.1999)). In a typical real estate transaction, for example, it might consist of a "[a] signed statement by a party (such as a tenant or mortgagee) certifying for another's

---

[15] By contrast, the term "promissory estoppel" refers to "[t]he principle that a promise made without consideration may nonetheless be enforced to prevent injustice if the promisor should have reasonably expected the promisee to rely on the promise and if the promisee did actually rely on the promise to his or her detriment." *Black's Law Dictionary* 591 (8th ed. 2004).

benefit that certain facts are correct, as that a lease exists, that there are no defaults, and that rent is paid to a certain date." *Id.* In that situation, the purpose of an estoppel certificate, as the term suggests, is to assure a purchaser that the lessee will not later make claims that are inconsistent with the representations in the certificate, upon which the prospective purchaser is entitled to rely. *See id.; see also Plaza Freeway Ltd. P'ship v. First Mountain Bank,* 81 Cal. App. 4th 616, 628-29 (2000); *cf. Liberty Prop. Trust v. Day-Timers, Inc.,* 815 A.2d 1045, 1052 (Pa. Super. Ct. 2003) (lessee was equitably estopped from asserting an oral modification of the lease where lessee clearly denied the existence of any such modification in an estoppel certificate); *Va. Highland Assocs. v. Allen,* 330 S.E.2d 892, 895-96 (Ga. Ct. App. 1985).

## III.    Equitable Estoppel as Applied to the Hilton Estoppels

As a threshold matter, the Court finds that the Estoppels are clearly inaccurate. Each Estoppel purports to list all of the agreements between Hilton and the Tenant Entities, but omits the NDAs. Hilton has not claimed, nor could it, that the NDAs are not an agreement as that term is used in the Estoppels. Indeed, at the Hearing, Hilton appeared to concede that the NDAs should have been listed in the Estoppels. Trial Tr. vol. 2, 226:12-25 (Mr. Neff: "[The Estoppels] failed to note that there were NDAs."); *see* Trial Tr. vol. 1, 79:9-16. Thus, the Debtors have demonstrated that Hilton was aware of the true facts and that the Estoppels were inconsistent with those facts. *See Ware Supply Co*., 54 Cal. Rptr. at 680. Merely providing inaccurate information, however, is insufficient to establish equitable estoppel. As explained below, the Debtors' claim fails because they have not established that it was reasonable under the facts and circumstances for them to rely on the Estoppels for the purpose of establishing that no NDAs existed in 2011.

### A. The Estoppels Were Not Directed to the Debtors and Did Not Inure to their Benefit

The Debtors cannot claim reasonable reliance on the Estoppels because the Estoppels were not directed to or purported to inure to the benefit of CNL-AB or the Debtors, other than the Tenant Entities. Rather, they were issued to MS Resort Holdings LLC and MS Resort Acquisition LLC c/o Morgan Stanley Real Estate Investing, and inured to the benefit of MS Resort Holdings LLC and the Tenant Entities. *See* Estoppels at 1, §10. It is not surprising that the Estoppels were directed to these two MSREF entities given that the Estoppels were issued in connection with a 2007 transaction whereby MSREF became the ultimate owner of the Resorts. *See* Trial Tr. vol. 1, 63:2-3 (Feldman: "[It is] [c]ustomary in [a hotel] transaction [that] the estoppel certificate is issued to the party requesting it."); Trial Tr. vol. 1, 64:14-17 (Feldman: "The Hilton estoppels were addressed to the MSREF parent company, they were addressed to the tenant, and they were addressed to the MSREF acquisition company, which was then merged into the prior [owner] after the transaction closed."). As the Estoppels do not mention any Debtor other than the Tenant Entities, it is unreasonable for parties not mentioned in the Estoppels to rely – almost four years later – upon the Estoppels to establish the existence or non-existence of the NDAs. *See Carrano v. Castro*, No. L/T 85442/04, 2005 WL 1528747, * at 4 (N.Y. Civ. Ct. 2005) ("In the absence of clear language evidencing that intent [that the 1992 stipulation be binding on the successors and assigns of the parties], the new landlord is not bound by an agreement to which he was not a party and did not have an opportunity to negotiate.").

The Debtors not identified in the Estoppels nonetheless seek to benefit from the Estoppels by arguing that they are somehow successors or assigns to MSREF. For example, the Debtors argue that their "reliance traces back to 2007, when MSREF completed its acquisition of the Resorts . . . relying upon the truthfulness of the Hilton Estoppels." Debtors' Memorandum of

Law [ECF No. 24] ("Debtors' Memo.") ¶ 38.  The Debtors further contend that CNL-AB, their current ultimate equity owner, is a successor-in-interest to certain corporate mezzanine lenders, including MSREF.[16]  Debtors' Statement ¶ 37.  The Court rejects the Debtors' "successors and assigns" argument for several reasons.

As a threshold matter, the Plaintiffs have not established that MSREF relied upon the Estoppels in connection with the 2007 transaction.  Mark Hudspeth's Dep. 14:14-15:3, 31:1-25, 56:4-57:21, Ex. I to Hilton's Statement (ECF No. 25) (MSREF's 30(b)(6) witness testifying that he was not aware of the Estoppels when the MSREF Transaction closed).  But even more fundamentally, this argument fails because – even if you assume that the Debtors are successors to and assigns of MSREF – the Estoppels do not inure to the benefit of the successors and assigns of the parties specified therein.[17]  Estoppels §10.  That fact distinguishes this case from the traditional circumstances where such estoppel certificates have been enforced.  *See, e.g., Gen. Electric Capital Corp. v. Domino's Pizza*, No. 93 Civ. 5070 (PKL), 1994 WL 256776 (S.D.N.Y. June 2, 1994) (court held that estoppel certificate was enforceable by the assignee lender as its purpose was to induce lender to make a loan to the landlord; estoppel certificate stated that the loan would be secured by an assignment to lender of landlord's interest in the lease, with the intent and understanding that the certificate would be relied upon by the lender).  Further weakening the Debtors' position here is the fact that Hilton specifically deleted language

---

[16] Hilton disagrees with this characterization, arguing that the Debtors have not submitted any evidence to support their assertion.  Hilton's Response ¶ 37, (ECF No. 38).  Similarly, Hilton has argued that the evidence does not support the Debtors' claim that various parties relied upon the Estoppels, including the corporate mezzanine lenders.  *See* Hilton's Statement ¶¶ 45-46, 49-55, 60-61.  Given the ruling in this Opinion, the Court does not need to resolve these issues.

[17] This fact also suggests that CNL-AB cannot establish privity with those parties to whom the Estoppels were directed.  *See, e.g.*, 31 C.J.S. Estoppel and Waiver § 216 (2012) ("Estoppel applies only to parties and those in privity with them, and mere strangers cannot take advantage of it.  Estoppels operate as to or between, and only as to or between, parties to the subject matter or transaction which is the basis of the estoppels and their privies . . . .").

from earlier draft versions of the Estoppels that would have covered successors and assigns. *See* Hilton's Statement ¶ 23; Debtors' Response ¶ 23, (ECF No. 42); *see also Fort Independence Indian Cmty. v. California*, 2008 WL 6137129, at * 4 (E.D.Cal. 2008) ("In order to fully evaluate defendants' claim for equitable estoppel, the court must consider the totality of the circumstances . . . ."). [18]

Finally, the Debtors' successors and assigns argument fails because the entity that the Debtors claim is the successor or assign to MSREF – namely, CNL-AB – is not a Debtor in this bankruptcy proceeding or a Plaintiff in this adversary proceeding. Rather, CNL-AB is the indirect equity holder of the Resorts. In response to this awkward fact, the Debtors contend that they are asserting equitable estoppel on behalf of all their stakeholders, including equity holders and creditors. [19] Trial Tr. vol. 2, 169:5-176:1. The equitable estoppel doctrine requires, however, that a court examine whether the party asserting estoppel was presented with incorrect information and, having reasonably relied upon that information, was damaged as a result. It is impossible to conduct such an inquiry without considering the facts and circumstances from the vantage point of the particular party claiming reliance. The mere fact that this adversary

---

[18] The fact that Hilton deleted such successors and assigns language during the drafting of the Estoppels also supports the notion that Hilton did not intend for its conduct – namely, the Estoppels – to be relied upon by the parties asserting equitable estoppel. *See Ware Supply Co.*, 54 Cal. Rptr. at 680 ("[The party to be estopped] must intend that his conduct will be acted upon, or act in such a manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon . . . .") (internal citations and quotations omitted).

[19] Nonetheless, the crux of the alleged harm claimed by the Debtors centers on CNL-AB's interests given the Debtors' focus on (i) the CNL-AB Transaction that closed prior to the Debtors filing for bankruptcy; and (ii) the Debtors' restructuring strategy whereby CNL-AB will be negatively impacted if the Fee Owners are liable for damages resulting from the rejection of the Management Agreements. Debtors' Memo. ¶¶ 38-44; *see also* Trial Tr. vol. 2, 169:21-170:3 (the Debtors arguing that if Hilton is not estopped, then "Hilton's claim is going to be paid first from the fee owner's assets, and it's going to dilute the recovery to all the other stakeholders, including other creditors, including equity, CNL-AB"). Notably, no other creditor has weighed in on this dispute.

complaint was filed in a bankruptcy case does not permit a court to ignore the requirements of the cause of action pled.[20]

As for the Tenant Entities that were named in the Estoppels, they are unable to establish a claim for equitable estoppel, but for a different reason:  they cannot claim reasonable reliance upon the Estoppels' failure to mention the NDAs.  This is true for two reasons.  First, the Tenant Entities were parties to the NDAs and, thus, were aware of their existence.[21]  Second, the Tenant Entities were already liable to Hilton for any breach of the Management Agreements and nothing in the Estoppels changed that fact.  The Tenant Entities, therefore, cannot claim any detrimental reliance on the Estoppels.

### B.  The Estoppels Were Not Prepared for the CNL-AB Foreclosure

The Debtors also cannot claim reasonable reliance on the Estoppels because the Estoppels were issued for the MSREF Transaction in 2007.  Estoppel certificates are generally issued in connection with a specific transaction to certify that certain facts are true in connection with that transaction.  Feldman's Report at 9 ("To be of any value to the potential purchaser, investor, or lender, i.e., so they could rely upon it, the estoppel should be issued (a) to the potential purchaser, investor or lender, and (b) contemporaneously with the closing of the purchase, investment or loan transaction."); Trial Tr. vol. 1, 68:17-69:5.  The Estoppels explicitly state that they were issued in connection with the MSREF Transaction.  *See, e.g.*, Arizona

---

[20] For these same reasons, Hilton persuasively argues that the named Plaintiffs lack standing to pursue this lawsuit because they cannot establish an injury.  *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1091 (2d Cir. 1995) ("'A plaintiff must always have suffered 'a distinct and palpable injury to himself.'").  As the Court finds that the Plaintiffs unreasonably relied on the Estoppels, the Court does not address the Defendant's standing argument.

[21] While the equity ownership of the companies that own and run the Resorts has changed from MSREF to CNL-AB, the Fee Owners and the Tenant Entities have not changed.  *See* Kamensky First Day Aff. ¶ 20 ("At the time of [the MSREF Transaction], the new owners largely retained the organizational structure that had been in place, and renamed each of the entities that was a 'CNL' entity as a 'MSR' entity."); *see also* Trial Tr. vol. 1, 133:12-135:16 (Feldman's testimony that the equity owners of the Fee Owners changed, but not the Fee Owners themselves).

Biltmore Estoppel at 1 ("In connection with the upcoming merger by MS Resort Acquisition

LLC . . . and MS Resort Holdings LLC . . . into [the pre-existing owner of the Resorts]").  The

Debtors' claimed reliance only becomes more problematic given the four year gap between the

MSREF Transaction and the CNL-AB Transaction.  *See* Michael E. Feldman's Dep. vol. 1, 70:8-

16, 72:8-73:12, Ex. F to Hilton's Response (ECF No.38) (Feldman: "[Estoppel certificates] don't

have a useful shelf life.").

The Debtors nevertheless claim that they can rely upon the Estoppels based on Section

15.9 of the Management Agreements, which provide, in part, that the Estoppels "may be relied

upon by others with whom the [p]arty requesting such certificate may be dealing."  *See, e.g.*,

Arizona Biltmore Management Agreement § 15.9.  Specifically, the Debtors assert that the

Tenant Entities constitute such "party" and that the Tenant Entities "deal" with the Fee Owners

as they lease the Resorts from the Fee Owners, thus, the Fee Owners can rely on the Estoppels.

Debtors' Memo. ¶ 9, (ECF No. 39).   The Debtors' theory ignores, however, the fact that the Fee

Owners were also signatories to the NDAs and, as parties knowledgeable about the NDAs, the

Fee Owners cannot invoke equitable estoppel here.  The Debtors argue that the Fee Owners are

empty corporate shells that are not bound by, or, were unaware of, the NDAs due to a change in

the equity owners of the Fee Owners.  *See* Trial Tr. vol. 2, 161:19-25 (Mr. Leon:  "The fee-

owners are a special purpose vehicle.  They have no employees.  What the fee-owners do is lease

the properties to the tenant entities.  That's what they do.  What matters is who's the owner of

the fee-owner, who's the asset manager for the fee-owner.");  Trial Tr. vol. 2, 163:7-9 (Mr Leon:

"[T]he way they [MSREF] learn about what the fee-owners' obligations are is through these

estoppel certificates.").  The Debtors do not provide any legal support, however, for the

proposition that a mere change in equity ownership of the Fee Owners somehow wipes the slate

clean for those entities of their contractual obligations and the related legal consequences.  If that were true, such a change in control of the equity ownership would presumably effect all of the other contracts to which the Fee Owners are a party, including the operating leases for these Resorts.  Moreover, it appears that the sensible way to understand this language is to consider the "requesting part[ies]" as the Tenant Entities and the parties with whom they were dealing to be the parties involved in the MSREF Transaction.  Thus, the Debtors have failed to establish that the term "others" as it is used in section 15.9 of the Management Agreements should be extended to include the circumstances here.  *See Landbery*, 101 Cal. Rptr. at 346 ("It is incumbent on one who advances [equitable estoppel] to prove its dominant essentials, leaving nothing to surmise or questionable inference.").

### C.  The Estoppels Are Not a Substitute for the Due Diligence Required in Connection with the CNL-AB Foreclosure

Finally, the Debtors' equitable estoppel claim fails given the undisputed evidence that appropriate due diligence on hotel transactions would have uncovered the existence of the NDAs, or, at the very least, put a party on notice of their existence.   Hilton's expert witness Michael Feldman testified as to the due diligence typically performed for transactions like the MSREF Transaction and the CNL-AB Transaction, and what that due diligence would have revealed.  The Debtors did not offer its own expert on the issue, and the Court finds Feldman to be a credible witness on this point.  Several of his specific opinions are of particular relevance.

Starting with the language in the Management Agreements, Feldman opined that any reasonable prudent investor who conducted due diligence would have realized that the NDAs existed.   Feldman's Report at 4-9.  Feldman testified that the Estoppels "reference[] the [M]anagement  [A]greement[s].  So you have to go read the [M]anagement Agreement[s] to

understand the [Estoppels]."  Trial Tr. vol. 1, 76:2-7.   Specifically, Section 9.3 of each

Management Agreement provides, in part, that the "[Operating Lessee] (Tenant Entities)

shall: . . . (iii) obtain from all existing and future Mortgages and lessors and provide [Hilton]

with *non-disturbance agreements in form and content reasonably acceptable to [Hilton] . . . .*"

Feldman's Report at 7 (emphasis added); *see also* Trial Tr. vol. 1, 70:16-74:1.  This specific

reference to the NDAs for Hilton is sufficient to defeat the Debtors' equitable estoppel claim

because it puts a reader on notice of the possible existence of the NDAs.  *See Hampton v.*

*Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960) ("[E]quitable estoppel does not

erase the duty of care and is not available for the protection of one who has suffered loss solely

by reason of his own failure to act or inquire."); *Suburban Pump & Water Co. v. Linville*, 60

Ariz. 274, 284-85 (1943) (one who acts with a "careless indifference to means of information

reasonably at hand or ignores highly suspicious circumstances which should warn him of danger

or loss cannot invoke the doctrine of estoppel"); *Bohonus v. Amerco*, 124 Ariz. 88, 90 (1979)

("Reliance is not justified where knowledge to the contrary exists.") (internal citation omitted);

*State v. Employers Mut. Cas. Co.*, 708 N.E.2d 1224, 1228 (Ill. Ct. App. 1999) (plaintiff cannot

"neglect to seek information that is easily accessible, and then charge his ignorance to others").[22]

        In addition, Feldman cited certain other provisions of the Management Agreements that

provide extraordinarily broad rights to Hilton as further support that a reasonably prudent

investor or purchaser would have suspected that NDAs existed.  Feldman's Report at 8.   For

example, Feldman testified that Hilton's unlimited cure rights – Hilton may cure any

performance test failure as set forth in Section 3.3 of the Management Agreements – is "quite

---

[22] Relatedly, the Debtors and CNL-AB had opportunities to inquiry about the full extent of Hilton's relationship
with the Resorts, including reaching out to Hilton directly. *See, e.g.*, Hilton's Statement ¶ 63 (CNL-AB never asked
Hilton or its lawyers whether Hilton had any NDAs); Hilton's Statement ¶ 71 (the Debtors never requested that
MSREF obtain updated Estoppels from Hilton); Hilton's Response at 10 ("[N]either CNL-AB nor the Debtors
requested estoppels for the Debtors' benefit.").

extraordinar[y]" since most long-term agreements limit the number of times to cure from one to three times.  Trial Tr. vol. 1, 81:25-82:14; *see also* Feldman's Report at 8 ("Unlimited cure rights are unheard of in the hotel industry, and this right gave Hilton the power to retain the Management Agreements even if Hilton performed poorly . . . .").  Feldman also testified that these management contracts usually provide that the Tenant Entities may terminate the agreement early, which "would kick in maybe after three, five years; the most . . . is ten years." Trial Tr. vol. 1, 82:15-19.  The Management Agreements here, however, provide that the Tenant Entities cannot terminate the Management Agreements and pay Hilton a termination fee "until after the initial twenty-year period of [the] agreement[s]."  Trial Tr. vol. 1, 82:15-23; *see also* Feldman's Report at 8 ("Generally, these provisions do not allow for a termination on sale for five to ten years . . . ."); *see, e.g.*, Arizona Biltmore Management Agreement § 3.4.1.  All of these extensive protections for Hilton in the Management Agreements, Feldman concluded, demonstrate the great lengths Hilton went to ensure protection for its long-term investment in the Resorts, thereby putting a reasonably prudent investor or purchaser on notice of the possible existence of NDAs.  Trial Tr. vol. 1, 80:24-84:9.  *See Freightways, Inc. v. Arizona Corp. Comm'n*, 129 Ariz. 245, 247 (1981) (reliance should be considered reasonable if, among other things, a party "would not have been put on notice to make further inquiries").

The need for due diligence about the NDAs is further confirmed by the Resorts' REIT structure. Feldman testified that NDAs are typical in situations where, as here, there is a ground lease[23] and "where you have a REIT and a taxable REIT subsidiary, which has a lease from the

---

[23] "Under a ground lease, a landlord conveys to a tenant its complete present possessory interest in a parcel of real property for a specified period of time.  For almost all purposes, the land leased to the tenant will 'belong' to the tenant for at least the economic life of a particular real estate development project."  Martin Kobren, *Three Perspectives on Ground Lease Negotiations*, 19 RELJ 40 (Summer 1990); *N. Royalton City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 950 N.E.2d 955, 958 n.1 (Ohio 2011) ("A ground lease is a lease that grants the right to use and occupy land." (internal citation and quotations omitted).

REIT owner to the taxable [REIT] subsidiary."  Trial Tr. vol. 1, 72:24-73:2, 89:22-90:1.

Feldman explained that taxable REIT subsidiaries, such as the Tenant Entities, are "not much

more than a single purpose shell entity formed solely for federal income tax purposes[, which] is

well known in the hotel industry."  Feldman's Report at 6.  The taxable REIT subsidiary

engages an independent contractor to manage the hotel, and pays income tax on the net income

and "whatever is left is then dividended [sic] by the taxable REIT subsidiary to its parent[,] the

REIT, which then leaves [the taxable REIT subsidiary] with little or no capital."  Trial Tr. vol. 1,

84:25-86:9.  Given the Resorts' REIT structure, Feldman concluded that any sophisticated party

engaged in a hotel transaction of this type should have known that the NDAs existed since the

Tenant Entities (taxable REIT subsidiaries) lacked any significant assets against which a

management company like Hilton could recover.  Feldman's Report at 5-7; Trial Tr. vol. 1,

86:13-20 ("[T]he taxable REIT subsidiary not being an entity with any significant assets, you

would certainly know that there would be a nondisturbance agreement between the REIT, the

taxable REIT subsidiary, and the management company.").

Indeed, Feldman asserted that a reasonably prudent investor or purchaser had notice that

the NDAs existed because Hilton would want to protect itself and its significant investment in

the Resorts.  If Hilton did not have any NDAs, then Hilton would have no recourse against the

Fee Owners if the Tenant Entities terminated the Management Agreements; Hilton would have

the same concern if the Fee Owners terminated the operating leases, thereby impacting the

Management Agreements with Hilton losing its substantial investment in the minimally

capitalized Tenant Entities.  Feldman's Report at 7; Trial Tr. vol. 1, 84:1-5 ("You would expect

Hilton to attempt to secure that investment, if you look at the agreement, and they did secure that

. . . investment through all of these other aspects of the agreement, plus the SNDA and the

NDAs.").  Feldman testified that since the taxable REIT subsidiary does not have any assets, a

claim by the management company against it for damages "doesn't get the management

company anywhere, which is why the management companies insist on NDAs."  Trial Tr. vol. 1,

88:4-9; *see generally* Trial Tr. vol. 1, 87:17-89:4.  Given Hilton's investment of up to $70

million in the Resorts, the Court finds Feldman's testimony persuasive.

The Debtors object that Feldman has offered an improper legal opinion on the ultimate

issue to be decided by the Court.  Rather than rely on Feldman's opinion on the ultimate issue,

however, the Court takes his testimony as evidence – unrebutted by the Plaintiffs – of what due

diligence on a hotel transaction such as the CNL-AB Transaction would show.  See Fed. R. Evid.

702(a) (expert testimony appropriate where it will assist the trier of fact in understanding the

evidence).  The Court considers his testimony persuasive as to the requisite due diligence in light

of the other relevant facts in this case, namely that the Estoppels were issued for a prior

transaction some four years earlier to different parties.  Taking all this evidence as a whole, the

Court reaches the ultimate conclusion that it was unreasonable for Debtors in 2011 to blindly

rely on the Estoppels. [24]

---

[24] The equities also do not favor the application of equitable estoppel here.  Equitable estoppel would principally –
or, perhaps, exclusively – benefit the equity owner of the Resorts, CNL-AB, despite the fact that CNL-AB was a
stranger to the MSREF Transaction where the Estoppels were provided, and that CNL-AB is not a Plaintiff in this
adversary proceeding.  Further, it would work a grave hardship to Hilton, which entered into the NDAs to protect its
$70 million commitment in the Resorts.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court rejects the Plaintiffs' claim of equitable

estoppel and finds in favor of the Defendant Hilton on the merits of this adversary proceeding.

The Debtors are directed to settle an order on three days' notice.


Dated: New York, New York
       **May 11, 2012**


                                        _/s/ **Sean H. Lane**_
                                         UNITED STATES BANKRUPTCY JUDGE